# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**JOANNE EVELYN SCHULTZ,**
**Individually and as Personal Representative**
**of the Estate of Donald Walter Schultz,**

        Plaintiff,

                                                                                  **Case No. 08-C-919**

    **-vs-**

**THE GLIDDEN COMPANY, et al.,**

        Defendants.

## DECISION AND ORDER

In this diversity action, Joanne Evelyn Schultz alleges that her husband, Donald Walter Schultz, died of Acute Myeloid Leukemia (AML) because he was exposed to products containing benzene while he worked as a painter in an automobile manufacturing plant. The two remaining defendants, Akzo Nobel Paints LLC (sued as The Glidden Company) and Durako Paint and Color Corporation, both move for summary judgment. For the reasons that follow, these motions are granted.

## BACKGROUND

In approximately 1981, Donald Walter Schultz started working for American Motors Corporation, subsequently known as Chrysler Corporation (collectively AMC/Chrysler), as a maintenance painter. Schultz worked as a maintenance painter for a total of six (6) years, although not consecutively due to layoffs. He worked as a painter at plants located in Kenosha, Wisconsin, Cleveland, Ohio, and Los Angeles, California. His duties included

cleaning and painting equipment, painting floors, painting walls and ceilings, and painting pipes. In approximately 1989, Schultz retired due to disability not related to leukemia. On or about November 25, 2005, Schultz was diagnosed with leukemia. He passed away on September 23, 2006.

Schultz alleges that during his time working for AMC/Chrysler he was exposed to benzene-containing products that were produced, manufactured, and marketed by the defendants. Schultz further alleges that the defendants were negligent in their production, manufacture, design, marketing or sale of benzene-containing products; that the defendants' benzene-containing products were defective and unreasonably dangerous such that the defendants should be strictly liable; and that Schultz's cancer was a direct and proximate result of his exposure to the defendants' benzene-containing products.

## JURISDICTION

On February 2, the Court issued an order directing the plaintiff to correct a variety of jurisdictional deficiencies in her pleadings. The Court is now satisfied that there is complete diversity between the plaintiff and the remaining defendants in this case. 28 U.S.C. § 1332(a)(1).

The plaintiff, Joanne Evelyn Schultz, is bringing claims on her own behalf and on behalf of the estate of her husband. Therefore, Ms. Schultz's citizenship and the citizenship of her husband are both relevant to the jurisdictional analysis. 28 U.S.C. § 1332(c)(2); *Gustafson v. zumBrunnen*, 546 F.3d 398, 400 (7th Cir. 2008). Mr. and Mrs. Schultz were married in Wisconsin in 1996. ECF No. 222, Akzo's Proposed Findings of Fact, ¶ 12.

However, the Schultzes permanently moved to Florida in 1997. *Id.*, ¶¶ 13-15. Mr. Schultz lived in Florida until he died, and Ms. Schultz still lives in Florida. ECF No. 243, Motion for Leave to Amend Complaint, ¶ 2. Therefore, the plaintiff is a citizen of Florida for purposes of § 1332.

With respect to Akzo Nobel Paints, LLC (sued as The Glidden Company), the "citizenship of an LLC for purposes of the diversity jurisdiction is the citizenship of its members." *Cosgrove v. Bartolotta*, 150 F.3d 729, 731 (7th Cir. 1998). The sole member of Akzo is Akzo Nobel Coatings, Inc., a Delaware corporation with its principal place in Kentucky. ECF No. 242, Supplemental Statement on Citizenship. The other remaining defendant, Durako, is a Michigan corporation with its principal place of business in Michigan. Finally, Schultz alleges that the amount in controversy exceeds $75,000. Therefore, the Court may exercise jurisdiction pursuant to § 1332(a)(1).

**SUMMARY JUDGMENT**

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The plain language of the rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To avoid summary judgment in a toxic tort case, the plaintiff must produce admissible expert testimony on the issue of both general and specific causation.

*Aurand v. Norfolk So. Ry. Co.*, 802 F. Supp. 2d 950, 964 (N.D. Ind. 2011) (citing *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639 (7th Cir. 2010)). General causation addresses whether a particular agent can cause a particular illness. *Milward v. Acuity Specialty Products Grp., Inc.*, 639 F.3d 11, 13 (1st Cir. 2011). Specific causation addresses whether that agent *in fact* caused the particular plaintiff's illness. *Id.*

A witness who is qualified by knowledge, skill, experience, training or education may testify in the form of an opinion if (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. It is the district court's role to ensure that expert testimony is both relevant and reliable. *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). To do so, the Court must ascertain whether the expert is qualified, whether his or her methodology is scientifically reliable, and whether the testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* at 893-94 (citing *Myers* at 644).

To satisfy her burden of proof, Schultz must prove that her husband was "exposed to a sufficient amount of the substance in question [benzene] to elicit the health effect in question [leukemia]." *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1156 (E.D. Wash. 2009). To this end, Schultz retained James Stewart, an industrial hygienist who

-4-

attempted to "reverse engineer" Mr. Schultz's actual, quantitative exposure to benzene. After issuing a series of reports, Dr. Stewart ultimately concluded that Mr. Schultz's "mean ppm-year exposures to benzene had a mean of 22 ppm-years for the Main Plant and 2.0 ppm-years for the Lake Front Plant for a total of 24 ppm-years (90% of the cumulative exposures fell between 4.8 and 55 ppm-years)." ECF No. 219-11, Exhibit K to Rattan Declaration, Supplemental Report. As one district court explained, expressing dose in "ppm-years" is "easily understood. If a person was exposed to 1 ppm of a compound every year for 20 years, his or her total exposure to the compound would be 20 ppm-years." *Baker v. Chevron USA, Inc.*, 680 F. Supp. 2d 865, 870 n.3 (S.D. Ohio 2010). According to Akzo's expert toxicologist, the prevailing trend of medical and toxicological literature holds that the minimum exposure level necessary for benzene to cause AML is 40 ppm-years. "Although there is reliable epidemiological evidence that high dose, chronic exposure to benzene is causally related to the development of some types of MDS or AML, there is also evidence from the scientific and medical literature that a 'threshold' exists for this effect. That is, the risks of developing MDS/AML associated with benzene exposures below this threshold would be indistinguishable from background. Though not uniformly agreed upon, the threshold for benzene induced AML appears to be between **40 and 500 ppm-years** (cumulative exposure), with an average value of ~200 ppm-years." ECF No. 219-6, Exhibit F to Rattan Declaration, Report of David Pyatt at 8 (emphasis in original).

The defendants argue that Dr. Stewart's calculations should be excluded as unreliable opinion testimony under *Daubert*. Setting aside the errors underlying Dr. Stewart's opinion

(of which there are many), the Court finds that the defendants are entitled to summary judgment because Schultz's causation expert, Dr. Steven Gore, relies on an inadmissible "no-threshold" theory of causation.

According to Dr. Gore, when "assessing specific causation in a cancer case, the quantified dose or exposure of the individual takes on far less significance than such information would have in the context of analyzing specific causation of most non-malignant diseases. This is true because, in the context of most non-malignant diseases, the oft-repeated aphorism that 'the dose makes the poison' generally holds true. *However, in the context of chemically-caused cancers generally, and exposure to benzene specifically, the absence of a safe 'threshold' level of exposure to the cancer-causing substance substantially alters the nature of the causation inquiry.*" ECF No. 219-22, Exhibit V to Rattan Dec., Report of Steven Gore, ¶ 17 (emphasis added). Dr. Gore continues: "When no safe threshold of exposure to a carcinogen has been established, this means that each and every exposure to the chemical will increase the risk of development of the types of cancer that the carcinogen is capable of causing. To the extent that an individual has developed a type of cancer caused by the carcinogen in question, then any non-trivial exposure to that carcinogen during a time frame consistent with the range of latency periods with the disease should be considered as a probable substantial factor that contributed to the development of the individual's cancer. To the extent a known risk factor for a particular type of cancer has been identified in an individual who has developed that form of cancer, exclusion of that risk factor as one of the probable causes contributing to the cancer is not scientifically possible."

*Id.*, ¶ 18. Therefore, for purposes of Dr. Gore's opinion, Dr. Stewart's "exposure" testimony is relevant only to the extent that it establishes that Schultz's exposure to benzene was "non-trivial." "Of course, every person is exposed to background levels of carcinogens in the environment on a daily basis. Thus, to make the causation analysis meaningful, evidence of exposure to the carcinogen in question must be more than trivial, hypothetical, negligible or theoretical." *Id.*, ¶ 19.

The "no-threshold" theory of causation in toxic tort cases has been roundly rejected by courts across the country. "[The] theory that any amount of exposure more than negligible should be considered substantial risk factor for AML flies in the face of the scientific literature reviewed and other expert testimony in this case that there is a threshold or dose below which you do not see a statistically significant risk of developing AML. Even though benzene has been shown to cause AML, it is too difficult a leap to allow testimony that says any amount of exposure . . . to this toxin can cause AML and caused AML in [the plaintiff]." *Henricksen* at 1166; *see also Baker* at 878 n.9 (The "one-hit" or "no threshold" theory of causation in which "exposure to one molecule of a cancer-causing agent has some finite possibility of causing a genetic mutation leading to cancer" is not a "reliable theory for causation under *Daubert* standards") (internal citations omitted) (collecting cases). The Court agrees with the reasoning of these cases and finds that Dr. Gore's opinion on causation must be excluded under *Daubert*. "The linear non-threshold model cannot be falsified, nor can it be validated. To the extent that it has been subjected to peer review and publication, it has been rejected by the overwhelming majority of the scientific community. It has no

-7-

known or potential rate of error. It is merely a hypothesis." *Whiting v. Bos. Edison Co.*, 891 F. Supp. 12, 25 (D. Mass. 1995); *see also Sutera v. Perrier Grp. of Am., Inc.*, 986 F. Supp. 655, 666 (D. Mass. 1997) (There is "no scientific evidence that the linear no-safe threshold analysis is an acceptable scientific technique used by experts in determining causation in an individual instance").

Schultz argues that Dr. Gore does not exclusively rely on a "no threshold" theory of causation because he cites studies which demonstrate that benzene exposures less than that suffered by Mr. Schultz (but purportedly more than negligible) create a statistically significant increased risk of AML. This argument sidesteps the basic thrust of Dr. Gore's opinion, which is that the amount of benzene exposure is irrelevant, so long as it is "non-trivial." Moreover, the studies cited by Dr. Gore assume shorter latency periods than Schultz's 16-year latency period. *Henricksen* at 1156 (the "chronological relationship between exposure and effect must be biologically plausible"). Therefore, even accepting the disingenuous argument that Dr. Gore is not articulating a "no threshold" theory of causation, his opinion still does not qualify as reliable evidence that Schultz's AML was caused by benzene exposure.

Finally, Dr. Gore's opinion must be excluded because he fails to rule out other potential causes of Schultz's AML. A "medical expert's opinion based upon differential diagnosis normally should not be excluded because the expert has failed to rule out every possible alternative cause of a plaintiff's illness. . . . However, a 'differential diagnosis that fails to take serious account of other *potential* causes may be so lacking that it cannot provide

a reliable basis for an opinion on causation.' Thus, if an expert utterly fails to consider alternative causes or fails to offer an explanation for why the proffered alternative cause was not the sole cause, a district court is justified in excluding the expert's testimony." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir. 2001) (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir. 1999)) (emphasis added). It is undisputed that Schultz smoked one to one and a half packs of cigarettes per day for 35 to 40 years until 1997 (just 8 years prior to his AML diagnosis), but Dr. Gore failed to rule out smoking as a potential cause of Schultz's AML. In fact, Dr. Gore opines that Schultz's smoking "may have contributed" to Schultz's development of AML. Dr. Gore insists that this "in no way undermines" his conclusion that Schultz's benzene exposure played a "substantial role in the development of the disease." Gore Report at ¶ 16. Far from "ruling out" smoking as a potential cause, Dr. Gore actually ruled it in. Therefore, his opinion on causation is inherently unreliable. *See Myers* at 645 (opinions excluded under *Daubert* because they did not "rule in" or "rule out" any potential causes); *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 156 (3d Cir. 1999) (where a defendant points to a "plausible alternative cause and the doctor offers *no* explanation for why he or she has concluded that was not the sole cause, that doctor's methodology is unreliable") (emphasis in original); *Henricksen* at 1156 ("the likelihood that the chemical caused the disease or illness in an individual should be considered in the context of other known causes"). An expert "does not establish the reliability of his techniques or the validity of his conclusions simply by claiming that he performed a differential diagnosis on a patient." *Guinn v. AstraZeneca Pharm. LP*, 602 F.3d

1245, 1244 (11th Cir. 2010) (quoting *McClain v. Metabolife Int'l Inc.*, 401 F.3d 1233, 1253 (11th Cir. 2005)).

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

1. Schultz's motion for leave to file an amended complaint [ECF No. 243] is **GRANTED**;

2. Schultz's motion for leave to file excess pages [ECF No. 233] is **GRANTED**;

3. Akzo's motion for summary judgment on *Daubert* issues [ECF No. 216] is **GRANTED**;

4. Durako's motion for summary judgment [ECF No. 211] is **GRANTED**;

5. Akzo's motion for partial summary judgment on medical special damages [ECF No. 220] is **DENIED** as moot; and

6. This matter is **DISMISSED** in its entirety. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 20th day of March, 2012.

**BY THE COURT**:

_____
**HON. RUDOLPH T. RANDA**
**U.S. District Judge**