# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**JOANNE EVELYN SCHULTZ, Individually
and as Personal Representative of the Estate of
Donald Walter Schultz,**

        Plaintiff,

    **-vs-**                   **Case No. 08-C-919**

**THE GLIDDEN COMPANY, n/k/a AKZO
NOBEL PAINTS LLC,**

        Defendant.

---

## DECISION AND ORDER

---

In this diversity action, Joanne Evelyn Schultz alleges that her late husband, Donald Walter Schultz, developed acute myeloid leukemia (AML) because he was exposed to products containing benzene while he worked as a maintenance painter for American Motors Corporation in Kenosha, Wisconsin. The two remaining defendants, Durako Paint and Akzo Nobel Paints, LLC, moved for summary judgment, and the Court granted both motions. ECF NO. 252; 2012 WL 968005 (E.D. Wis. March 21, 2012). On appeal, the Seventh Circuit affirmed with respect to Durako, but reversed and remanded with respect to Akzo. 721 F.3d 426 (7th Cir. 2013).

In the prior district court proceedings, Akzo argued that it was entitled to summary judgment because the testimony of Schultz's experts was inadmissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Two experts were at issue: Dr. James Stewart, an industrial hygienist, and Dr.

Stephen Gore, an oncologist. Dr. Stewart offered an opinion regarding the level of Schultz's exposure to benzene; Dr. Gore opined regarding causation. The Court bypassed the challenge to Dr. Stewart's opinion, although it noted in passing that there were "many" errors underlying that opinion. Instead, the Court focused on the opinion of Dr. Gore, finding that Akzo was entitled to summary judgment because Dr. Gore relied on an inadmissible "no-threshold" theory of causation, and also because Dr. Gore failed to rule out other potential causes of Schultz's AML.

On appeal, the Seventh Circuit found that the Court's concern about Dr. Gore's no-threshold theory would have been justified, but for the fact that Dr. Stewart calculated Schultz's exposure at 24 parts per million per years ("ppm-years").[1]

> *Had Dr. Stewart calculated that Schultz's exposure was only 5 ppm-years, we would have a different case, in which the district court's concern about an ill-defined floor for safety would have been justified.* But we do not. Far from limiting his testimony to the proposition that the amount of exposure may be 'irrelevant,' Dr. Gore focused specifically on the amount of benzene to which Schultz had been exposed and related this amount to the scientific literature. He stated that, given a 15-year latency period, exposures of less than 6 ppm-years are *unlikely* to cause AML, but exposures of 11-ppm years or more put one at an eight-times greater risk of AML (as compared to the general population). *Had Schultz been exposed to less than 6 ppm-years, Akzo would have been entitled to point out to the district court that Schultz's own expert was unwilling to point to benzene exposure as a likely cause of Schultz's AML.* In short, Dr. Gore not only identified 11 ppm-years as a level that has been proven to be toxic, but he also suggested that 6 ppm-years might be a lower limit given current knowledge (while as a careful scientist reserving the possibility that even less exposure might be dangerous). There was no need for him to do more for purposes of Rule 702.

---

[1] "If a person is exposed to 1 ppm of a compound every year for 20 years, his or her total exposure to the compound would be 20 ppm-years." *Baker v. Chevron USA, Inc.*, 680 F. Supp. 2d 865, 870 n.3 (S.D. Ohio 2010).

- 2 -

*Schultz* at 432 (emphasis added).

After the remand, the Court conducted a telephonic scheduling conference, at which time Akzo asked the Court to revisit its motion for summary judgment, particularly as it was directed towards Dr. Stewart's testimony. The Court agreed to do so, but after further analysis, the Court finds that Dr. Stewart's opinion is admissible pursuant to the mandate rule, which "requires a lower court to adhere to the commands of a higher court on remand." *United States v. Polland*, 56 F.3d 776, 777 (7th Cir. 1995). When a court of appeals "has reversed a final judgment and remanded the case, the district court is required to comply with the express or implied rulings of the appellate court." *Waid v. Merrill Area Public Sch.*, 130 F.3d 1268, 1272 (7th Cir. 1997). In finding Dr. Gore's opinion admissible, the Seventh Circuit specifically relied on Dr. Stewart's conclusion that Schultz was exposed to more than 11 ppm-years of benzene. Since Dr. Gore's opinion is admissible only on the assumption that Dr. Stewart's opinion is admissible, the Seventh Circuit implicitly ruled that the latter opinion is admissible. This makes logical sense because the clear import of the Seventh Circuit's decision is that Schultz may proceed to trial. *Schultz* at 434 ("with Dr. Gore's contribution restored to the case, we conclude that Schultz has presented enough to defeat Akzo's motion for summary judgment").

That said, in an abundance of caution, and to reinforce the implicit findings of the Seventh Circuit, the Court now explicitly finds that Dr. Stewart's testimony is admissible.[2]

---

[2] To be clear, the Court also rejects its prior comment, made in *dicta*, regarding the "many"

- 3 -

Before admitting expert scientific testimony, the Court must perform a "gatekeeping" function in order to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert* at 589. The Court makes the following inquiries: first, the expert must be qualified by knowledge, skill, experience, training, or education; second, the proposed expert testimony must assist the trier of fact in determining a relevant fact at issue in the case; third, the expert's testimony must be based on sufficient facts or data and reliable principles and methods; and fourth, the expert must have reliably applied the principles and methods to the facts of the case. *Lees v. Carthage College*, 714 F.3d 516, 521-22 (7th Cir. 2013). With regard to reliability, the Court considers a non-exhaustive list of guideposts, including whether the scientific theory can be or has been tested, whether the theory has been subjected to peer review and publication, and whether the theory has been generally accepted in the relevant scientific, technical, or professional community. *Am. Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 817 (7th Cir. 2010) (citing *Daubert* at 593-94).

To account for the uncertainty in estimates of certain parameters used in the exposure estimate, Dr. Stewart[3] conducted a Monte Carlo analysis. As one court explained, instead of "simply averaging the input values, Monte Carlo analysis uses randomly-generated data points to increase accuracy, and then looks to the results that those data points generate. The methodology is particularly useful when reaching an exact

---

errors underlying Dr. Stewart's opinion.

[3] Akzo does not dispute Dr. Stewart's credentials as an industrial hygienist. The Court finds that he is qualified to render an opinion on benzene exposure in this case.

- 4 -

numerical result is impossible or infeasible and the data provide a known range – a minimum and a maximum, for example – but leave the exact answer uncertain." *Lyondell Chem. Co. v. Occidental Chem Corp.*, 608 F.3d 284, 293 (5th Cir. 2010). In the related fields of industrial hygiene and environmental health, this method has been endorsed by the United States Environmental Protection Agency and the American Industrial Hygiene Association.

After a series of corrections, Dr. Stewart settled on a mean exposure of 24 ppm-years. "22 ppm-years for the Main Plant and 2.0 ppm-years for the Lake Front Plant for a total of 24 ppm-years (90% of the cumulative exposures fell between 4.8 and 55 ppm-years)." ECF No. 227-2, Supplemental Report of Dr. Stewart. Generally speaking, Akzo takes issue with the amount of variance in the range of possible outcomes, but this is a fallow critique. "[J]ust because a Monte Carlo simulation produces a range of outcomes, rather than one single numerical outcome, does not mean it is speculative." *Lyondell* at 294. And even though the simulation produces a "statistical range of likely outcomes and not one determinative answer," the analysis is relevant because it "supports choosing one result over another, and certainly assist[s] the district court in its decisionmaking." *Id.* Akzo also takes issue with the inputs, under the theory that "garbage in" equals "garbage out." This strikes the Court as fodder for cross-examination. For example, Akzo disputes the use of 200 gallons of paint per day, but there is evidence in the record to support that level of usage. Similarly, there is evidence to support Dr. Stewart's assumptions regarding work place protection (i.e., respirators), plant size and volume, duration of exposure, number of hours painting each day, air exchange rate, and air speed and inter

- 5 -

zonal air flow.  A *Daubert* inquiry "is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy.  If the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'"  *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (quoting *Daubert* at 596).

Having found that Dr. Stewart's opinion is admissible at trial, the Court must now consider Akzo's alternative motion for partial summary judgment.  In this motion, Akzo argues that Florida law, not Wisconsin law, applies to Schultz's recovery of special medical damages.  Schultz moved to Florida with his wife after he retired.  Schultz was diagnosed in Florida, treated in Florida, and eventually died in Florida on September 23, 2006.  Schultz's widow, the plaintiff in this case, still lives in Florida.

In diversity cases, a federal district court looks to the substantive law of the state in which it sits, including that state's choice of law rules.  *Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 751 (7th Cir. 2012).  In Wisconsin, the "threshold determination in a conflict of laws case is whether a genuine conflict exists.  If so, an application of the choice-influencing considerations should proceed unless it is decided that application of any of the multiple choices of law would constitute mere 'officious intermeddling.'"  *Gavers v. Fed. Life Ins. Co.*, 345 N.W.2d 900, 901-02 (Wis. Ct. App. 1984) (citing *Hunker v. Royal Indemnity Co.*, 204 N.W.2d 897, 902 (Wis. 1973)).  The choice-influencing factors are:  (1) predictability of results, (2) maintenance of the

- 6 -

interstate order, (3) simplification of the judicial task, (4) advancement of the forum state's governmental interest, and (5) application of the better rule of law. *Heath v. Zellmer*, 151 N.W.2d 664, 672 (Wis. 1972).

The parties agree that there is a conflict between Wisconsin and Florida law regarding the "collateral source" rule, which generally provides that a plaintiff's recovery of medical expenses will not be reduced by the fact that they were paid by some source collateral to the defendant, such as an insurance company. *Leitenger v. Van Buren Mgmt., Inc.*, 720 N.W.2d 152, 156 (Wis. Ct. App. 2006). Schultz accrued $762,173.54 in medical expenses for his cancer treatment. Medicare paid $202,323.31 towards this amount, and Schultz's medical providers are not attempting to recover the balance. Under Wisconsin law, Schultz would be entitled to recover the entire balance so long as that amount represents the "reasonable value of medical and nursing services reasonably required by the injury." *Id.* (citing *Ellsworth v. Schelbrock*, 611 N.W.2d 764, 769 (Wis. 2000)). Under Florida law, Schultz would be limited to the amount paid out by Medicare. *Cooperative Leasing v. Johnson*, 872 So. 2d 956, 960 (Fla. Dist. Ct. App. 2004) ("the appropriate measure of compensatory damages for past medical expenses when a plaintiff has received Medicare benefits does not include the difference between the amount that the Medicare providers agreed to accept and the total amount of the plaintiff's medical bills"). Accordingly, the Court agrees with the parties that there is a conflict between Wisconsin and Florida law.

Next, the Court considers "whether the contacts of one state to the facts are so obviously limited and minimal that application of that state's law constitutes officious

- 7 -

intermeddling." *Am. Standard Ins. Co. of Wis. v. Cleveland*, 369 N.W.2d 168, 171 (Wis. Ct. App. 1985). Akzo argues that the application of Wisconsin law would constitute "officious intermeddling," but the Court finds the opposite to be true. Even though Schultz died in Florida, and even though his widow still lives there, the negligent conduct that allegedly led to Schultz's death occurred in Wisconsin. The focus of this lawsuit is what happened in Wisconsin, not Florida. Wisconsin's collateral source rule is "intended to deter negligent conduct by placing the full cost of the wrongful conduct on the tortfeasor." *Id.* Applying Florida law would interfere with this goal.

The same result is reached by analyzing the choice-influencing factors. For the reasons just stated, the fourth factor, advancement of the forum state's governmental interest, favors Wisconsin law. Under the second factor, maintenance of interstate order, a state that is "minimally concerned" should "defer to the interests of a state that is substantially concerned." *Hunker* at 903-04. Florida has no interest in limiting the amount of Schultz's recovery from a non-Florida corporation for tortious conduct occurring in Wisconsin simply because Schultz later became a resident of Florida. If anything, Florida should welcome a windfall of money to one of its citizens at the expense of Akzo, a Delaware corporation with its principal place of business in Kentucky. Under the first factor, predictability of results, Akzo purposefully marketed and sold its products to a company doing business in Wisconsin, so the application of Wisconsin law could not have been unexpected. From Akzo's perspective, Schultz's move to Florida was a fortuitous happenstance, not a predictable result. For Schultz, the Court doubts that his decision to move to Florida was influenced by a law that would limit his recovery in tort.

- 8 -

Under the third factor, application of the better rule of law, Akzo argues that there is an apparent trend away from the "traditional" form of the collateral source rule. However, many states still adhere to the traditional version of the rule. Larry D. Warren, *Paid or Incurred and the Collateral Source Rule Across the Country*, FDCC Quarterly, Spring 2009, at 207. Therefore, Wisconsin's collateral source rule is not anachronistic, or the vestige of a "creed outworn." *Hunker* at 907. The remaining factor, simplification of the judicial task, is neutral. Neither law is more difficult to apply than the other.

Akzo's motions for summary judgment [ECF Nos. 216, 220] are **DENIED**.

Dated at Milwaukee, Wisconsin, this 13th day of September, 2013.


**BY THE COURT:**

**HON. RUDOLPH T. RANDA**
**U.S. District Judge**

- 9 -